J-S56025-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| STEFFAWN SPRIGGS | |
| Appellant | No. 1821 MDA 2014 |

Appeal from the Judgment of Sentence September 24, 2014
In the Court of Common Pleas of Franklin County
Criminal Division at No(s): CP-28-CR-0002338-2012

BEFORE:  SHOGAN, J., JENKINS, J., and PLATT, J.[*]

MEMORANDUM BY JENKINS, J.:                    **FILED NOVEMBER 06, 2015**

Appellant Steffawn Spriggs appeals from the September 24, 2014 judgment of sentence entered in the Franklin County Court of Common Pleas following his jury trial conviction for first-degree murder, discharge of a firearm into an occupied structure, and recklessly endangering another person.[1]  We affirm.

In its opinion, the trial court fully and correctly sets forth the relevant facts and procedural history of this case.  Opinion, 3/13/2015, at 2-11.  Therefore, we have no reason to restate them.

Appellant raises the following issues on appeal:

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 2502(a), 2707.1(a), and 2705, respectively.

1. Did the [t]rial [c]ourt err with regard to its August 6, 2014 order denying [] Appellant's motion for appointment of outside counsel where a conflict of interest pursuant to the Pennsylvania Rules of Professional Conduct was discovered shortly before trial based upon [d]efense [c]ounsel's office having dually represented [Appellant] and the Commonwealth's witness Michael Anthony Woods between June 20, 2013 and October 23, 2013 where the testimony of Mr. Woods played a critical part in Commonwealth and [d]efense theories and, if so, is reversal of [Appellant's] convictions appropriate?

2. Was the evidence produced at trial insufficient to find Appellant guilty of the charged counts?

Appellant's Brief at 10.[2]

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Douglas W. Herman, we conclude Appellant's issues merit no relief. The trial court opinion comprehensively discusses and properly disposes of the questions presented. (*See* Trial Court Opinion, 3/13/2015, at 11-22) (finding: (1) there was no conflict based on dual representation at time of trial because representation of witness concluded over nine months prior to trial; (2) there was no actual conflict during time of dual representation because charges against witness were unrelated to charges against Appellant and there was no concern counsel would neglect a defense to attain more

---

[2] Appellant's 1925(b) statement also challenged the weight of the evidence. Appellant, however, waived this claim because he does not raise it in his brief. *See, e.g., Commonwealth v. Tiffany*, 926 A.2d 503, 512 (Pa.Super.2007) (claim raised in 1925(b) statement waived when Appellant did not raise it in appellate brief).

advantageous defense for witness; (3) there was no conflict based on prior dual representation because there was no actual conflict of interest because no indication counsel possessed confidential information which affected his ability to represent Appellant or that his loyalties were divided, (4) lack of conflict substantiated by testimony because counsel "did not hold back in his attempt to elicit testimony" from witness and Commonwealth brought out witness's *crimen falsi* conviction; (5) evidence sufficient to establish murder of first degree because, *inter alia*, multiple witnesses put Appellant in area with victim, witness stated Appellant approached him and victim with gun, description of shooter provided by victim prior to death matched Appellant, Appellant made incriminating statements to witnesses, witness gave Appellant gun about a week prior to shooting, Appellant's hat had gun residue, Appellant had two live rounds in his pocket when arrested, and Appellant stated "tomorrow is my birthday and all I can do is think about leave a nigga stink'n"; (6) evidence sufficient to establish discharge of firearm into occupied structure where the Woods' home was an occupied structure, the Woods heard gunshot, they saw a curtain move and a bullet hole in their window, and police found spent bullet on floor; witness testimony established bullet came through at approximately same time that victim was shot; and (7) evidence sufficient to establish Appellant recklessly endangered another person where he fired multiple gunshots at victim and misfired bullet into the Woods' home).  Accordingly, we affirm on the basis of the trial court's opinion.

Judgment of sentence affirmed.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>11/6/2015</u>

**THE COURT OF COMMON PLEAS OF THE 39th JUDICIAL DISTRICT OF PENNSYLVANIA – FRANKLIN COUNTY BRANCH**

| | |
|---|---|
| Commonwealth of Pennsylvania, | : Criminal |
| | : |
| vs. | : |
| | : Nos. 2338-2012 |
| Steffawn Alexander Spriggs, | : |
| Appellant | : |
| | : Judge Douglas W. Herman |

### Opinion sur Pa. R. App. P. 1925(a)

On August 8, 2014 a five day jury trial commenced and was concluded on August 14, 2014. Appellant was found guilty of murder of the first degree, discharge of a firearm into an occupied structure, and recklessly endangering another person. Appellant now appeals his judgment of sentence claiming that the Court erred in denying Appellant's Motion for Appointment of Outside Counsel where a purported conflict of interest existed because the Public Defender's Office represented both Appellant and a witness for the Commonwealth. Appellant also challenges the sufficiency and weight of the evidence. For the reasons that follow we submit that no error was committed by this Court and request the Superior Court to affirm Appellant's judgment of sentence.

### PROCEDURAL HISTORY

On September 23, 2012 Steffawn Alexander Spriggs ("Appellant") was charged with: murder of the first degree; discharge of a firearm into an occupied structure; and recklessly endangering another person. Appellant was represented by Ian Brink ("Defense Counsel") of the Franklin County Public Defender's Office ("PD's Office"). On August 6, 2014 Defense Counsel filed a Motion for Appointment of Outside Counsel on the basis that Defense Counsel dually represented Appellant and Commonwealth witness Michael Anthony Woods between June 20, 2013 and October 23, 2013. On August 6, 2014 after a hearing the Court denied Defense

Counsel's motion. Jury selection occurred on August 7, 2014. A five day jury trial was held on August 8, August 11, August 12, August 13, and August 14, 2014. During the trial the Commonwealth presented testimony from several witnesses while Appellant offered one expert witness.

On August 14, 2014 the jury found Appellant guilty of: Count 1, murder of the first degree; Count 3, discharge of a firearm into an occupied structure; and Count 4, recklessly endangering another person. Count 2, possession of a firearm was *nolle prossed*. On September 24, 2014 Appellant was sentenced to an aggregate sentence of life imprisonment. On September 30, 2014 the Court granted Defense Counsel's Motion to Appoint Additional Outside Counsel to assist Defense Counsel in Appellant's appeal. On October 24, 2014 Appellant filed a Notice of Appeal. On October 28, 2014 a concise statement was ordered. On November 14, 2014 Additional Counsel filed a Motion for Extension of Deadline to File Statement. The Court granted the motion on November 17, 2014 giving counsel 21 days after the filing of the transcripts to file a concise statement. On February 24, 2015 Appellant filed a Concise Statement of Matters Complained of on Appeal.

## FACTUAL BACKGROUND

The above charges arose from the killing of Calvin Beam ("the Victim") on September 17, 2012. On that date the Victim was shot with a gun three times in the area of Martin Avenue and North Franklin Street in Chambersburg, PA. A fourth bullet from the same gun that killed the Victim was shot inside a home at 35 North Franklin Street in Chambersburg, PA. Detective Todd Baker described the location of the crime scene as being in the area of the Franklin Fire Company and the Salvation Army.

2

John Boswell ("Mr. Boswell") testified that on September 17, 2012 he was meeting with other members of the Caving Club at the Franklin Fire Company on North Franklin Street and Martin Street in Chambersburg, PA and across the street from the Salvation Army. Something unusual happened that night so Mr. Boswell wrote it down the next morning on September 18, 2012. The Commonwealth admitted his notes as Exhibit 1. Mr. Boswell read Exhibit 1 into evidence:

> Okay. It's dated Monday, September 17, 2012 and it states Pat Minnick, Ken Tayman, Helen Tayman, Glen Sarvis and me, John Boswell, went to Fran's Inn after our monthly cave club meeting at the Franklin Fire Company. At 10:25 we left Fran's to head back to our cars and leave. As we approached the cars in the rear lot of the fire company we heard a series of pops in quick succession which I thought were firecrackers. I think it was one or two pops followed by very brief pause and then three or more additional pops. We got in the cars to leave and as I went to pull out I saw in my rearview mirror a man leaning in to the open passenger side door of Ken's truck where Helen was sitting. I thought it was either an intoxicated person or maybe a robbery, so I jumped out and ran around to intervene. The man clutched at me and said help me, help me, I've been shot and collapsed to the pavement. I saw no blood, just that he seemed out of breath so I asked where he was shot and he pointed to his stomach. I pulled up his shirt and didn't find a wound. I told him I don't see it and he pointed just below his naval where I saw a small hole with no blood. I told Pat Minnick he's been shot and Pat called 911 while Ken ran to get help from the fire company. I tried to make the man lie still but he was writhing around saying he couldn't breathe and his stomach hurt and he felt sick. I asked him who shot him and he said Mike and he described him as a black man with a long beard. He said he did not know Mike's last name or the reason why he shot him. Helen asked the man what his name was and he said Calvin Beam and that he was 18. He kept complaining that he couldn't breathe and he said he had been shot three times. Helen asked where else he was shot and he said his back. We pulled up his shirt to look and saw a wound on his upper left shoulder blade. We made him lie down again and then I saw another small hole in his neck. There was virtually no bleeding from the wounds in the neck and below the naval and just a little blood around the shoulder blade wound. At this time the rescue squad arrived followed shortly by the police probably 10 to 15 minutes after the 911 call.

(Transcript of Proceedings 32:19-34:8, August 8, 2014). Glen Sarvis ("Mr. Sarvis") also testified about that night. He stated that the group left the caving meeting at around 9:20 and went to Fran's across the street. When walking back to the parking lot Mr. Sarvis heard very rapid shots that he originally thought was firecrackers. After Mr. Boswell shut his vehicle off

3

they both went to where the Victim had been shot and Helen Tayman (Ms. Tayman) was tending to the Victim. Mr. Sarvis saw tiny puncture wounds in the Victim's belly and his neck. He did not hear the Victim say anything aside from stating that he could not breathe. After two firemen came out to help they asked the Victim if he knew who shot him and he the Victim stated "Mike." The Victim described the shooter as black with a long black beard. Mr. Sarvis called his wife after the ambulance had arrived to tell her that he would be late. The time was 10:38 p.m.

Frank ("Mr. Wood") and Marcella ("Mrs. Wood") Wood testified that on September 17, 2012 at 10:30 p.m. they were watching television inside their home at 35 North Franklin Street in Chambersburg, PA. They both testified that they heard a gunshot and the window curtain flew back. Looking at the window they noticed there was a bullet hole through it. Mr. Wood testified that they were sitting about eight feet from the television and Mrs. Wood testified they were five to six feet away from the curio cabinet where police believed that a bullet ricocheted. The Woods testified that they looked out of the window and saw a bunch of people gathered at the Franklin Fire Hall. Mrs. Wood "saw a boy down."

Detective Scott Mummert investigated the scene at the Woods' home at 35 North Franklin Street. He searched their home for a bullet that was shot through the window at the home. Detective Mummert testified that a spent bullet was found in the northeast corner of the living room. Using a protrusion rod the police were able to determine that bullet came from through the window from the general direction of the Salvation Army in the area where the Victim was found.

Officer Robert Peterson (now retired) was dispatched to the scene at the rear of the Franklin Fire Company. The Victim was lying on the ground in pain. When Officer Peterson

4

asked the Victim who shot him the Victim responded "Big Mike." Upon investigating the crime scene Officer Peterson walked up to a car with some people in it. He recognized that one of the people was Tyrone Baltimore ("Mr. Baltimore") and another person he knew was one of the Spriggs brothers. Although Appellant's brother Rashawn was in jail at the time, Appellant identified himself as Rashawn. Appellant also stated he did not know who "Bones" was.

Scott McNew ("Mr. McNew") testified that on the night in question he worked for West Shore EMS and was dispatched to the scene. He noticed that the Victim had visible gunshot wounds to his chest and abdomen and was informed by other personnel that there was a wound in the Victim's back.

Emily Everitts ("Ms. Everitts"), a registered nurse at Chambersburg Hospital, testified that the Victim was brought to the hospital at around 11:00 p.m. The Victim was showing signs of shock and repeatedly asked Ms. Everitts if he was going to die. Ms. Everitts asked the Victim what happened. The Victim replied that he had been shot two times and that the person's name who shot him was "John."

Jason Shannon ("Mr. Shannon") was working as a respiratory therapist in the emergency room on September 17, 2012. He asked the Victim whether he knew the person who had shot him. The Victim responded that he did not know who he was.

Dr. Scott Armen, a trauma surgeon and trauma medical director at Penn State Hershey Medical Center, testified regarding surgery that he performed on the Victim on the night of September 17, 2012. He noted that there was a bullet hole in the Victim's stomach and one in the chest area. At 2 a.m. the Victim died of cardiac arrest during the surgery.

Jeffrey Conner ("Mr. Conner"), the Franklin County Coroner, performed an autopsy on the Victim and determined that the cause of death was "multiple gunshot wounds" due to being

5

"shot by another person." (Commonwealth's Ex. 10). Forensic pathologist Rameen Starling-Roney ("Mr. Roney") testified that in his expert opinion he believed to a reasonable degree of medical certainty that the Victim's death was caused by multiple gunshot wounds.

Gary Duncan ("Mr. Duncan") of the United States Marshal Service testified that on September 18, 2012 he was contacted by the Chambersburg Police Department which requested him to locate Appellant. On September 19, 2012 Mr. Duncan went to the area of 16B, Hall Manor in Harrisburg based on a tip that Appellant was there. Appellant was in fact there and Mr. Duncan and his team arrested Appellant. Mr. Duncan observed his team member recover two unspent .22 caliber rounds from Appellant's pocket upon patting Appellant down. They also found a hat on the couch that Appellant was sitting on. Mr. Duncan called Officer Karen Lyda who is a forensic investigator to process the scene and collect evidence.

On September 19, 2012 after Appellant was apprehended Detective Mummert interviewed him at the Harrisburg Police Department. The audio was recorded and admitted into evidence. (Commonwealth's Ex. 20). During the interview Appellant stated that he asked a "tall boy" on Franklin Street whether he knew where he could get some "green." Appellant described the tall boy as a tall white male with shoulder length blonde hair. Appellant stated that the tall white boy said he did not have any green so Appellant left. Appellant said he did not know how the bullets got into his pocket at the time he was arrested.

In September 2012 James Armstrong ("Mr. Armstrong") lived in the area of the scene of the crime. On September 17, 2012 he was sitting outside on his porch. On that date Mr. Armstrong saw Appellant with the Victim. Prior to that time Mr. Armstrong saw Appellant, who he knew as "Bones," on three or four occasions and saw the Victim once before. Mr. Armstrong saw Appellant at 9 or 10 p.m. that night and then saw him again approximately 10 p.m. across

6

the street from Mr. Armstrong's home. Appellant and the Victim were standing there alone. Appellant was wearing jeans, a t-shirt, and a red Cincinnati baseball cap. When Mr. Armstrong walked outside Appellant called him over to apologize for "getting smart" with him earlier in the night. Mr. Armstrong then left Appellant to go to a bar called Fran's until around 10:30 p.m. After leaving the bar Mr. Armstrong was questioned by police and identified the Victim as being the same person he saw earlier with Appellant. Mr. Armstrong testified that at least fifteen to twenty minutes passed between the time that he was with Appellant and the Victim and when he saw the Victim after he was shot.

Zelda Hill ("Ms. Hill") testified that she knew both the Victim and Appellant. She stated that back in September of 2012 Appellant had a long beard and weighed less. On September 17, 2012 Ms. Hill saw Appellant, Lance Branche, and the Victim together at around 10:00 p.m. near the Salvation Army. Ms. Hill testified that they looked happy and she did not notice anything out of the ordinary.

Lance Branche ("Mr. Branche") is Appellant's cousin and the Victim was his good friend for about a year to a year and a half. He testified that on September 17, 2012 at around 9:30 or 9:45 p.m. he was with the Victim at Sheetz. After finally getting his car to start Mr. Branche and the Victim drove to the location underneath the trestle bridge and smoked synthetic marijuana. As they were smoking Appellant walked up to them and he was carrying a gun in his left hand. The gun was a silver revolver with a wooden handle. Mr. Branche recalled that Appellant was wearing jeans, a white shirt and a snapback baseball cap. He also noted that Appellant had a long beard at the time. At that point Appellant asked the Victim what his problem was with Ant. Ant, or Michael Anthony Woods, was a boy who got kicked out of the home that the Victim was living in. The Victim took Ant's place in the home. They then started walking toward Texas

7

Lunch near the Salvation Army and Appellant stated: "stop playing with me. Tomorrow is my birthday and all I can do is think about leave a nigga stink'n." (Transcript of Proceedings 31:5-7, August 11, 2014). At that point Appellant had the gun in his left pocket. Mr. Branche testified that at the corner of the Salvation Army Appellant "pulled his gun out and was like move and like I didn't know who he was talking to and then just pointed at me and he was like move and I was like, oh, like okay and then I just -- I left, ran and got in my car." (Id. at 32:13-17). Mr. Branche then went back to Texas Lunch to get his car. He drove towards the Salvation Army and saw that Appellant and the Victim were still there but there were cars behind him so he drove down an alley intending on returning to the area where they were standing. When he got there Appellant and the Victim were not in the area anymore. Mr. Branche parked his car, walked towards Lincoln Way, and was informed by the police that the Victim had been shot.

Hakeem Jefferson ("Mr. Jefferson"), Appellant's cousin, testified that on the night of September 17, 2012 he was at Jack's Bar with Rasheeda Harris and Ocquilla Trice ("Ms. Trice"). At some point Appellant needed a ride from Rasheeda Harris and so the three drove to Dave's Bar to pick Appellant up. Appellant got into the car. Appellant stated that he needed to get out of Chambersburg. The Commonwealth played a video of a statement that Mr. Jefferson made to police. (Commonwealth's Ex. 8). Mr. Jefferson stated to police that during the car ride Appellant said that there was an argument or fight involving himself, Lance Branche, and a "white boy." Appellant said he told the white boy to get on the ground. Mr. Jefferson asked Appellant if he shot the white boy and Appellant said "What do you think?" Mr. Jefferson responded "no," and Appellant said "no I did shoot him and if you have a problem with it I'll shoot you too." Appellant further stated to Mr. Jefferson: "if any of you say anything I'll kill you all right now . . ." Appellant also said the gun was the type where the shell does not come

8

out when you shoot it and the had the shells in his pocket. Appellant said he was not getting caught before his birthday or his mom's birthday. Mr. Jefferson stated that Appellant had on a black cap and he also heard bullets or change rattling in Appellant's pocket. In a video recorded statement to police Ms. Trice corroborated the story that Mr. Jefferson told in regards to picking up Appellant at Dave's Bar. (Commonwealth's Ex. 9).

Mr. Baltimore testified that on September 17, 2012 around 11 p.m. Appellant called him asking for a ride to Dave's Tavern (now 401 Pub). Mr. Baltimore told Appellant to walk over to Dilly's. Kyree Brown was also with Mr. Baltimore and the three of them got into Mr. Baltimore's car. Mr. Baltimore recalled that Appellant was wearing a black hat with a red bill and it had lettering on it. Mr. Baltimore dropped Appellant off at Dave's Tavern. Mr. Baltimore further testified that prior to September 17, 2012 his father had a .22 caliber revolver. Appellant asked Mr. Baltimore if he could borrow it and Mr. Baltimore let Appellant borrow it about a week prior to September 17, 2012. Mr. Baltimore never got the gun back.

Michael Anthony Woods ("Mr. Woods") testified that no one calls him by "Michael," "Mike," or "Big Mike." Rather, people refer to him as "Ant," "Anthony," or "Soldier." He stated that he had no problem with the Victim or the fact that the Victim moved into the home where he had previously lived. Mr. Woods stated that he was friends with the Victim and would have an occasional argument between friends with him. On the night of September 17, 2012 during the time of the murder Mr. Woods testified that he was at his mother's house in Shippensburg and learned of the Victim's death when watching the news.

Allison Murtha ("Ms. Murtha") examined the evidence collected. She is a manager of the forensic sciences department at RJ Lee Group and was qualified as an expert in the area of gunshot residue identification and collection. Ms. Murtha testified that gunshot residue is

9

emitted from any possible escape route on a gun when it is fired. It consists of a single particle of lead, antimony, and barium. Ms. Murtha testified that when gunshot residue is found on a person or clothing she can determine that a gun was fired. Ms. Murtha determined that the Cincinnati Reds baseball cap that was recovered from the couch had 2 gunshot residue particles on the outside of it that came from the discharge of a firearm. She also found 3 two-component particles and 18 one-component particles on the outside of the cap. On the inside of the cap Ms. Murtha found 1 two-component particles and 21 one-component particles. While the one and two-component particles do not necessarily indicate that a gun was fired, Ms. Murtha testified that the likelihood that a gun was fired is more substantial when combined with the discovery of gunshot particles.

Trooper Michael Fortley was offered by the Commonwealth as an expert in firearm and tool mark examination. After examining the three spent bullets found in the Victim's body and the one spent bullet found in the Woods' home, Trooper Fortley concluded that all four were "consistent in construction and configuration with a bullet manufactured by Remington." He further concluded that the two live rounds found in Appellant's pocket were manufactured by Remington based on the head stamp "REM" on them. Trooper Fortley also testified that two of the bullets found in the Victim and the bullet found in the Woods' home all came from the same firearm.

Gerald Styers ("Mr. Styers") testified as an expert for the defense in the area of firearm and tool mark examination. Mr. Styers examined the three fired .22 caliber bullets that were found in the Victim's body, one fired .22 caliber bullet that was found in the Woods' home, and two live cartridges found in Appellant's pocket when he was arrested. When examining the lands and grooves Mr. Styers opined that a determination of whether the four spent bullets were

10

manufactured by Remington could not be made because the bullets were also consistent in construction and configuration with a bullet made by other manufacturers in addition to Remington. That is, Mr. Styers could not conclude that the four fired bullets were manufactured by Remington. However, he testified that all of the bullets could have been fired from a revolver. In regards to the unfired bullets and the fired bullets Mr. Styers could only determine that they had the same color coding but could not determine if they were made by the same manufacturer because of the damage to the fired bullets.

## DISCUSSION

Pursuant to the concise statement of matters complained of on appeal Appellant raises three issues asserting that: (1) the Court erred in its August 6, 2014 Order denying Appellant's Motion for Appointment of Outside Counsel; (2) the evidence produced at trial was insufficient to find Appellant guilty of any of the charged Counts; and (3) the jury's verdict of guilty on Counts 1, 3, and 4 was against the weight of the evidence. For the reasons set forth below we submit that no error was committed by this Court and Appellant's judgment of sentence should be affirmed.

## I. Conflict of Interest

Appellant contends that the Court erred in its August 6, 2014 Order denying Appellant's Motion for Appointment of Outside Counsel. In his motion Appellant asserted that Defense Counsel dually represented Appellant and Commonwealth witness Michael Anthony Woods between June 20, 2013 and October 23, 2013 and therefore a conflict of interest existed that deprived Appellant of a fair trial. Appellant filed the motion on August 6, 2014 and the Court denied it after a hearing on that same date.

11

A conflict of interest claim raised on appeal is properly classified as an ineffective assistance of counsel claim. See Commonwealth v. Toro, 638 A.2d 991, 996 (Pa. Super. Ct. 1994). Here, Defense Counsel formally raised the conflict of interest issue before the Court by filing a Motion for Appointment of Outside Counsel two days prior to the start of trial on August 6, 2014. Because Defense Counsel raised the issue before this Court, the inquiry is not whether he was ineffective for failing to raise it. Rather, the Court must determine whether Defense Counsel was ineffective because "an *actual* conflict of interest adversely affected his []  performance." Id. (emphasis added).

> Moreover, ... while it is true that prejudice is presumed when counsel is burdened by an actual conflict of interest, this is so only if the defendant demonstrates that counsel actively represented conflicting interests and that an actual conflict of interest affected his lawyer's performance.... [A]n actual conflict of interest ... is evidenced whenever during the course of representation, the interests of appellant—and the interests of another client towards whom counsel bears obligations—diverge with respect to a material factual or legal issue or to a course of action.

Id. at 393-94 (quoting Commonwealth v. Smith, 552 A.2d 1053, 1059 (Pa. 1988)). Dual representation as well as prior representation can give rise to an actual conflict of interest.

Dual representation on its own does not rise to a conflict of interest. Toro, 638 A.2d at 394. A defendant must show at least a possibility of harm caused by the dual representation. Id. A defendant can satisfy this requirement by showing, *inter alia*, "that he had a defense inconsistent with that advanced by the other client, or that counsel neglected his case in order to give the other client a more spirited defense." Id. (quoting Commonwealth v. Breaker, 345, 318 A.2d 354, 356 (Pa. 1974)).

A conflict of interest in the context of prior representation may arise "if counsel reveals privileged communications of the former client or otherwise divides his loyalties so that he is incapable of diligently representing his client." Toro, 638 A.2d at 395.

12

In Toro, the defendant raised a conflict of interest claim where his trial counsel had previously represented the co-actor in a series of crimes committed by the two. Id. at 996. The Superior Court held that in the context of a possible conflict of interest such representation consisted of prior representation, not simultaneous dual representation, because at the time of the defendant's trial the charges against the co-actor had been dismissed. Id. However, the Superior Court held that there was no conflict of interest because "there [was] no indication that trial counsel possessed confidential information resulting from his prior representation of [the co-actor] which affected his ability to zealously and effectively represent [the defendant] . . . [nor was] there any evidence that trial counsel's loyalties were so divided that he was incapable of diligently representing appellant." Id. Trial Counsel also represented the co-actor at the time of the defendant's trial in a diverse unrelated incident. Id. The Superior Court noted that this did not result in an actual conflict of interest because the cases were completely unrelated criminal charges and thus "the concerns which normally arise where co-actors are represented by the same counsel, e.g., the possibility of inconsistent defenses or the neglect of one client's defense, were not implicated here." Id.

In the instant case Defense Counsel requested to withdraw from representation because the PD's Office represented Commonwealth witness Michael Woods between June 20, 2013 and October 23, 2013 while at the same time representing Appellant in this case. Defense Counsel claims that Mr. Woods' testimony played a critical part in the Commonwealth and Defense theories and by not granting Defense Counsel's withdrawal the Court deprived Appellant of a fair trial. Similar to the circumstances in Toro, the PD's Office's representation of Mr. Woods concluded on October 23, 2013, over nine months prior to the trial in this case. Therefore, there could have been no conflict of interest based on dual representation because the PD's Office's

13

representation of Mr. Woods ended prior to trial. As to any potential dual representation during the pretrial phase of this trial up until October 23, 2013, there was no actual conflict of interest. The PD's Office represented Mr. Woods in a case at docket no. 1174 of 2013 involving charges of: burglary; theft; and possession of drug paraphernalia. On August 7, 2013 Mr. Woods pleaded guilty to theft and possession of drug paraphernalia. That case was wholly unrelated to the case at bar and in no way involved Appellant. Appellant was not a defendant in that case, nor was he a witness. Thus, there was no concern over whether Defense Counsel would abandon or neglect a possible defense for his client in order to attain a more advantageous defense for Mr. Woods.

As to any potential conflict of interest based on prior representation the threshold question is whether Defense Counsel "divide[d] his loyalties so that he [was] incapable of diligently representing his client." Toro, 638 A.2d at 395. Based on Defense Counsel's Motion for Appointment of Outside Counsel and the hearing held on August 6, 2014 we did not believe that an actual conflict of interest was present. The mere fact that the PD's Office represented a Commonwealth witness in the past did not create an actual conflict of interest. Rather, some divergence of the interests of Appellant and Mr. Woods with respect to a material factual or legal issue or to a course of action was required. We did not discern any such conflict from Defense Counsel's motion or from the hearing. Defense Counsel simply cited the Rules of Professional Conduct regarding conflicts of interest but asserted no actual conflict. Like Toro, "there [was] no indication that [Defense Counsel] possessed confidential information resulting from his prior representation of Mr. [Woods] which affected his ability to zealously and effectively represent appellant" or that Defense Counsel's loyalties were so divided that he was could not diligently represent Appellant. Id.

14

The lack of conflict was substantiated by the testimony of Mr. Woods. It appeared that Defense Counsel sought to accuse Mr. Woods as the true perpetrator in the murder on the basis that the Victim stated that "Mike" or "Big Mike" shot him and Mr. Woods' first name is Michael. The record reveals that Defense Counsel did not hold back in his attempt to elicit testimony from Mr. Woods about whether anyone refers to him as "Mike" or "Big Mike." Representation of Mr. Woods in the unrelated theft matter had no influence on Defense Counsel's loyalties or his ability to engage in that line of questioning. Furthermore, the only relevance to Mr. Woods' *crimen falsi* conviction for theft related to impeachment of Mr. Woods for truthfulness and that was brought out immediately by the Commonwealth. Accordingly, we submit that no error was committed in denying Defense Counsel's Motion for Appointment of Outside Counsel.

## II. Sufficiency of the Evidence

Appellant contends that the evidence presented at trial was not sufficient to sustain the verdict of guilty for the offenses Appellant was convicted of. The standard of review regarding the sufficiency of the evidence is well established:

> The standard we apply when reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt.

Commonwealth v. McClendon, 874 A.2d 1223, 1228 (Pa. Super. 2005). In making its determination the court "may not weigh the evidence and substitute [its] judgment" for that of the jury. Commonwealth v. Mack, 850 A.2d 690, 693 (Pa. Super. 2004). "Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances." Commonwealth v. Eckrote, 12 A.3d 383, 386 (Pa. Super. 2010) (quoting

15

Commonwealth v. DiStefano, 782 A.2d 574, 582 (Pa. Super. 2001)). Importantly, "facts and circumstances established by the Commonwealth need not preclude every possibility of innocence." Mack, 850 A.2d at 693 (citations omitted). However, "guilt must be based on facts and conditions proved," and the evidence is insufficient if guilt is based on "suspicion or surmise." Eckrote, 12 A.3d at 386 (quoting Commonwealth v. Swerdlow, 636 A.2d 1173 (Pa. Super. 1994)). A conviction may be based entirely on circumstantial evidence if the "evidence links the accused to the crime beyond a reasonable doubt." Commonwealth v. Chmiel, 639 A.2d 9, 11 (Pa. 1994). To determine whether the evidence was sufficient to sustain a verdict, "the entire record must be evaluated and all evidence actually received must be considered." Mack, 850 A.2d at 693. The Commonwealth is the verdict winner and therefore we will view all the evidence admitted at trial in the light most favorable to the Commonwealth.

## A. *Murder of the First Degree*

"A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing." 18 Pa. C.S. § 2502(a). "Intentional killing" is "[k]illing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing." 18 Pa. C.S. § 2502. To obtain a conviction for murder of the first degree the Commonwealth must prove: "(i) a human being was unlawfully killed; (2) the defendant was responsible for the killing; and (3) the defendant acted with malice and a specific intent to kill." Commonwealth v. Jordan, 65 A.3d 318, 323 (Pa. 2013) cert. denied sub nom., Jordan v. Pennsylvania, 134 S. Ct. 1275 (2014). As to the third element, "'[p]remeditation and deliberation exist whenever the assailant possesses the conscious purpose to bring about death.'" Id. (quoting Commonwealth v. Drumheller, 570 Pa. 117, 808 A.2d 893, 910 (2002)). The period of time required to premeditate need not be long, as the design to kill can be devised inside of a second. Id.

16

Here, it is indisputable that the Victim was killed by gunshot wounds. Mr. Conner, the Franklin County Coroner, and forensic pathologist Mr. Roney both agree that the Victim was killed and the cause of death was multiple gunshot wounds. Several witnesses testified to observing the wounds caused by bullets.

While there were no eyewitnesses to the actual shooting of the Victim, a plethora circumstantial evidence was presented sufficient to establish that Appellant was the shooter who caused the Victim's death. The Victim was shot with a gun around 10:25 p.m. on September 17, 2012 as attested to by Mr. Boswell and Mr. Sarvis. Multiple witnesses put Appellant in the area with the Victim on September 17, 2012. Mr. Armstrong testified that he saw Appellant with the Victim around 10 p.m. He stated Appellant was wearing a Cincinnati baseball cap. After leaving Fran's at around 10:30 p.m. Mr. Armstrong was questioned by police regarding the shooting of the Victim. Ms. Hill saw Appellant, Mr. Branche, and the Victim together at around 10 p.m. near the Salvation Army. Mr. Branche testified that he and the Victim left Sheetz around 9:30 or 9:45 p.m. and went underneath the trestle bridge where Appellant eventually walked up to them with a gun in his possession. The three of them walked toward Texas Lunch near the Salvation Army. Mr. Branche testified that at the corner of the Salvation Army Appellant pointed his gun at Mr. Branche and told him to move and Mr. Branche went to get his car. Not long thereafter Mr. Branche found out that the Victim had been shot. Appellant himself admitted in a recorded interview with police that on that date he talked to a tall white boy with shoulder length blonde hair on Franklin Street. That description matches the Victim's appearance. He made further incriminating admissions to Mr. Jefferson and Ms. Trice who gave Appellant a ride to Jack's Bar on the night of September 17, 2012. Mr. Jefferson stated that during the car ride when asked if he shot the white boy Appellant said "I did shoot him and if

17

you have a problem with it I'll shoot you too." Mr. Baltimore revealed that about a week prior to September 17, 2012 he had let Appellant borrow his father's .22 caliber revolver, the same caliber bullet found in the Victim's body as testified to by the firearm experts. Mr. Baltimore never got that gun back from Appellant. The gunshot residue expert testified that Appellant's hat, which a number of witnesses testified Appellant was wearing, had gunshot residue on it leading to the inference that Appellant had recently shot a gun. When Appellant was arrested two live rounds manufactured by Remington were found in his pocket. While the firearm experts disagreed about whether it can be stated with certainty that the bullets found in the Victim's body were Remington brand, they both agreed that the live rounds found in Appellants pocket and the spent bullets found in the Victim's body were .22 caliber.

While the Victim stated to several witnesses that he was shot by someone named "Mike or Big Mike" and then stated to Ms. Everitts that he was shot by someone named "John," the Victim stated to Mr. Shannon that he did not know the person who shot him. Furthermore, the Victim stated that the person who shot him was black with a long beard, fitting the description of Appellant at that time. Such testimony goes to the weight of the evidence. Despite the conflicting testimony the jury chose to infer that Appellant was the shooter. The evidence presented at trial was sufficient for the jury to conclude that it was Appellant who caused the Victim's death by shooting the Victim. Appellant was seen in the in area of the crime scene with the Victim at around 10:30 p.m., the approximate time the Victim was shot; Appellant had a gun that was capable of firing .22 caliber bullets, the same caliber of bullets found in the Victim's body and on Appellant's person; live .22 caliber rounds were found in Appellant's pocket when he was arrested indicating he may have been in possession of a gun; Appellant was seen with a gun within a short time before the Victim was shot; Appellant admitted to police that he had

18

contact with a person who matched the Victim's description; Appellant admitted to Mr. Jefferson that he shot the "white boy;" and gunshot residue was found on the hat that Appellant was wearing. See Commonwealth v. Collins, 70 A.3d 1245, 1249 (Pa. Super. Ct. 2013) appeal denied, 80 A.3d 774 (Pa. 2013) (evidence was sufficient to support first degree murder conviction where the defendant was seen walking with the victim and codefendant towards the scene of the crime, the codefendant had a gun, the defendant and codefendant were seen running from the scene, and the defendant and the victim were members of a rival gang).

There was also sufficient evidence to establish that Appellant had the specific intent to kill. The Victim was shot three times. Firing a gun into the torso of the Victim three times in itself exhibits a conscious purpose to bring about the Victim's death. See Commonwealth v. Fletcher, 861 A.2d 898, 907 (Pa. 2004) (noting that "the use of a deadly weapon on a vital part of a victim's body is sufficient to establish the specific intent to kill"). Furthermore, Mr. Branche testified that when Appellant joined the Victim and Mr. Branche under the bridge he stated "tomorrow is my birthday and all I can do is think about leave a nigga stink'n." Such a statement demonstrates premeditation and deliberation on Appellant's part to bring about the death of someone. The fact that he did not state that the Victim was the person he would leave "stink'n" is of no consequence. Specific intent to kill need not be specific as to a particular person. See Commonwealth v. Jones, 912 A.2d 268, 288 (Pa. 2006). Rather, specific intent to kill a human is all that is required. Id. Additionally, there was evidence that Appellant had ill will towards the Victim. When Appellant initially met up with the Victim and Mr. Branche under the bridge, he confronted the Victim by asking what the Victim's problem was with Ant. Appellant also told Mr. Jefferson during the car ride that Appellant and "the white boy" had an argument or fight.

19

This evidence was sufficient to allow the jury to infer that Appellant had the specific intent to kill. Accordingly, the evidence was sufficient to sustain a conviction for first degree murder.

## B. *Discharge of a Firearm into an Occupied Structure*

A person commits the crime of discharging a firearm into an occupied structure "if he knowingly, intentionally or recklessly discharges a firearm from any location into an occupied structure." 18 Pa. C.S. § 2707.1(a). An "occupied structure" is "[a]ny structure, vehicle or place adapted for overnight accommodation of persons or for carrying on business therein, whether or not a person is actually present." 18 Pa. C.S. § 2707.1. The only limitation on the location requirement is that the actor discharging the firearm be located outside the occupied structure itself. Commonwealth v. McCoy, 962 A.2d 1160, 1169 (Pa. 2009).

Here, there is no doubt that the Woods' home is an occupied structure as it is a dwelling in which the Woods live. Furthermore, the undisputed evidence shows that a bullet was shot inside of the home of the Woods at 35 North Franklin Street in Chambersburg, PA. Mr. Wood testified that at 10:30 p.m. on that day he and his wife were sitting on the couch in his home at 35 North Franklin Street watching television. The Woods both stated that they heard a gunshot and the curtain flew back. They believed someone shot through the window. The Woods testified they saw a bullet hole in their window. Mr. Wood stated that it was the window that faces Lincoln Way. Mr. Wood testified that he and his wife were sitting six to eight feet away from the television at the time the bullet went through the window while Mrs. Wood testified they were sitting five to six feet away from the curio cabinet where the police think the bullet ricocheted. The police eventually found the spent bullet behind the Woods' television on the floor.

20

The evidence presented at trial was also sufficient to demonstrate that Appellant was the actor. As discussed supra, the evidence at trial demonstrated that Appellant shot the Victim with a gun at approximately 10:25 p.m. on September 17, 2012.[1] Mr. Wood believed the bullet came through his window at 10:30 p.m., approximately the same time. Mr. and Mrs. Wood both testified that they looked out the window and saw a bunch of people in the parking lot of the Franklin Fire Hall. Mrs. Wood "saw a boy down." The expert witnesses for both parties agreed that the bullet found in the Woods' home were consistent in construction with the undamaged bullet found in the Victim's pelvis area and that they were .22 caliber. Trooper Fortley also concluded that the bullets found in the Victim's body and the bullet found in the Woods' home were fired from the same gun. Based on the evidence establishing that Appellant was the actor in the murder of the Victim it was reasonable for the jury to infer that Appellant misfired one of his gunshots at the Victim and the bullet discharged into the nearby home of the Woods.

While Appellant may not have intentionally or knowingly shot his gun towards the house at 35 North Franklin Street, there was sufficient evidence demonstrating that Appellant was reckless in discharging the firearm which resulted in a bullet being propelled into the Woods' household. At the time in which Appellant was discharging a firearm he was in the act of committing a homicide. Although Appellant's intent was to fire a gun at the Victim, there can be no doubt that misfiring a bullet during a homicidal act and instead discharging the firearm into a residential home is at the very least reckless conduct. That is, one who intentionally fires a gun at another person in an area with nearby homes knows of the substantial and unjustifiable risk that a bullet may discharge into a home. When looked at in the light most favorable to the Commonwealth, the evidence easily establishes that Appellant consciously disregarded that risk

---

[1] See Section II(A).

21

when he fired the gun. Accordingly, the evidence presented at trial was sufficient for the jury to conclude that Appellant discharged a firearm into an occupied structure.

## C. *Recklessly Endangering Another Person*

A person commits the crime of recklessly endangering another person (REAP) "if he recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury." 18 Pa. C.S. § 2705.

> A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

18 Pa. C.S. § 302(b)(3). "Serious bodily injury" is "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ." 18 Pa. C.S. § 2301; Commonwealth v. Martuscelli, 54 A.3d 940, 949 (Pa. Super. Ct. 2012).

For the same reasons stated above, Appellant's claim of insufficiency regarding REAP must fail.[2] When Appellant fired multiple gunshots at the Victim and misfired bullet into the Woods' home he acted recklessly. The danger posed to others when firing a gun is inherent and it was reasonable for the jury to conclude that Appellant knew of the danger. Furthermore, the stray bullet went through the Woods' home propelling into an area which was only feet from where the Woods were sitting. Had the bullet come in on a different angle or had either of the Woods been in the path of the bullet at the time it entered through the window, serious injury or death could have ensued. Accordingly, there was sufficient evidence to sustain Appellant's conviction of REAP.

---

[2] See Section II(B).

22

## III. <u>Weight of the Evidence</u>

Appellant contends that the jury's verdict on Counts 1, 3, and 4 were against the weight of the evidence. However, Appellant failed to raise this issue in a motion for a new trial or post-sentence motion or at any time prior to sentencing.

> A claim that the verdict was against the weight of the evidence **shall** be raised with the trial judge in a motion for a new trial:
> (1) orally, on the record, at any time before sentencing;
> (2) by written motion at any time before sentencing; or
> (3) in a post-sentence motion.

Pa. R. Crim. P. 607(A) (emphasis added). "'The purpose of this rule is to make it clear that a challenge to the weight of the evidence must be raised with the trial judge or it will be waived.'" Commonwealth v. Priest, 18 A.3d 1235, 1239 (Pa. Super. Ct. 2011) (quoting Commonwealth v. Bond, 985 A.2d 810, 820 (2009)). Thus, Appellant has waived this issue. See Priest, 18 A.3d at 1239 (holding that the defendant waived his weight of the evidence claim on appeal in first degree murder conviction where he did not raise claim with trial court orally or in writing before sentencing or in a post-sentence motion).

## CONCLUSION

In light of the foregoing discussion we suggest that no error was committed during these proceedings and that there was sufficient evidence presented at trial to sustain Appellant's convictions. Furthermore, Appellant waived his challenge to the weight of the evidence by failing to raise the claim with this Court. Therefore, we respectfully request that the Superior Court affirm Appellant's judgment of sentence.